IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA 1860.

## Ashhurst *et al. versus* The Montour Iron Company.

The courts of Pennsylvania have no jurisdiction, in equity, to decree a sale of mortgaged premises, at the instance of the mortgagee; although the mortgagor may be a corporation, and the mortgage given in trust to secure its bonds.

They might acquire jurisdiction in a suit by the *cestuis que trust* against the mortgagees, and having thus assumed jurisdiction of the subject-matter, proceed to decree a sale for the benefit of the bond-holders; but they cannot do so, at the suit of the mortgagees against the mortgagor.

*It seems,* that trustees may apply to the court having jurisdiction of their accounts, for its assistance and protection in the administration of the trust.

APPEAL IN EQUITY from the Court of *Nisi Prius.*

This was a bill in equity exhibited by John Ashhurst and Edwin M. Lewis, who survived Isaac R. Davis, against The Montour Iron Company, for the foreclosure of a mortgage executed to the complainants upon all the property of the Company, in trust for the bond-holders thereof. The mortgage was as follows:—

"An indenture made this twenty-eighth day of September, in the year of our Lord one thousand eight hundred and fifty-five (1855), between The Montour Iron Company of the one part, and Isaac R. Davis, John Ashhurst and Edwin M. Lewis, of the city of Philadelphia, of the other part. Whereas, The Montour Iron Company, for the purpose of raising the sum of six hundred thousand dollars, in order to enable them to pay existing debts, and to furnish the necessary capital to carry on their business, have determined, at a meeting of the stockholders, duly convened and

(30)

held on the twenty-sixth day of September, Anno Domini 1855, to issue the bonds of the company for the said sum of $600,000, bearing an interest of six per cent. per annum, payable half-yearly on the first days of January and July ; and have authorized the managers of the said company to borrow the said sum, and issue twelve hundred bonds, numbered from 1 to 1200 inclusive, each bond being given for the sum of $500, in the following form, viz. :—" [Here followed a form of bond.]

" And have also authorized and directed the said managers of the said company, in order to secure the payment of said principal and interest, to make, execute, seal, and deliver, in the name and under the corporate seal of the said company, to the said trustees, and the survivors and survivor of them, and the heirs, executors, administrators and assigns of such survivor, a mortgage on the whole of the real estate, machinery, and fixtures belonging to the said company, whatsoever and wheresoever the same may be ; to be held by them, and the survivors and survivor of them, and the heirs, executors, administrators and assigns of such survivor, in trust for the purposes and subject to the conditions and provisions herein contained.

" Now, therefore, this Indenture witnesseth, that the said The Montour Iron Company, for and in consideration, as well of the premises, and for the better securing the payment of the said loan, principal and interest, unto the holders of the bonds issued under the provisions hereof, as of the further sum of five dollars, unto the said The Montour Iron Company, well and truly paid by the said Isaac R. Davis, John Ashhurst, and Edwin M. Lewis, at and before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have granted, bargained, sold, aliened, enfeoffed, released, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, release, and confirm unto the said Isaac R. Davis, John Ashhurst, and Edwin M. Lewis, and to the survivors and survivor of them, and the heirs, executors, administrators and assigns of such survivor :" [Here followed a description of the mortgaged premises.]

" Together with all and singular the iron-works, foundries, machine-shops, mills, furnaces, tenements, hereditaments, and appurtenances whatsoever thereunto belonging or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof, and all the estate, right, title, interest, property, claim, and demand whatsoever of them, the said Montour Iron Company, of, in and to the same, and every part and parcel thereof ; to have and to hold the same, with the appurtenances, unto the said Isaac R. Davis, John Ashhurst, and Edwin M. Lewis, and to the survivors and survivor of them, and the heirs, executors, administrators and assigns of such survivor, for their only use and behoof ; but in trust nevertheless for, and upon the uses,

[Ashhurst *et al. v.* The Montour Iron Company.]

intents, trusts, and purposes, herein mentioned, contained, and expressed, and for and upon no other uses, trusts, or purposes whatsoever, that is to say:

"1st. In trust to permit and suffer the said Montour Iron Company to retain the free, absolute, and uncontrolled use and possession of the estate hereinbefore mentioned, described, and intended to be now or hereafter conveyed and mortgaged; and to use, occupy, manage, and control the same for the mining of ore, manufacture of iron, and for all or every other purpose whatever, as though this indenture had not been made, until by the provisions hereof, the trustees for the time being shall be required to enter and take possession thereof, under the provisions and for the purposes of this trust. .

"2d. And upon this further trust, whenever, according to the provisions hereof, it shall become the duty of the trustees for the time being to enter upon and take possession of the premises herein described and conveyed or intended so to be, then immediately either to issue process upon this indenture of mortgage, and sell the property hereby mortgaged and conveyed by due course of law; or to enter upon and take possession thereof; or with or without entering upon and taking possession, to sell and dispose of the same in whole or in part, in such way, by public auction, after having given at least three months' public notice, to be published twice a week in two daily newspapers in the city of Philadelphia, and two daily newspapers in the city of New York, at any time or times, for any price or prices, on any terms, for cash or on credit, with any conditions or reservations of rents, or subject to any mortgages or securities for the purchase-moneys, or any part or parts thereof, as in the sole and absolute discretion of the trustees for the time being (for the exercise of which discretion the said trustees shall not be made in any way, nor by any person or persons, bodies politic or corporate, liable or responsible), shall appear best for the interest of the holders of the said bonds issued according to and intended to be secured by this indenture; and to make, execute, and deliver unto the purchaser or purchasers thereof, good and sufficient indentures or conveyances, vesting in him or them a full and absolute title in fee simple, or for any other lesser estate, in the premises thereby conveyed, freed and discharged from all trusts whatever, and without any obligation on the said purchaser or purchasers to see or to be responsible for the application or misapplication of the purchase-money, or for the propriety or expediency of the exercise of any power herein contained; in relation to which, the execution of indentures or conveyances by the trustees, shall be taken and considered, in all cases and before all tribunals, to be conclusive upon the parties hereto, as well as upon the holders of the bonds issued as aforesaid.

" 3d. And upon this further trust, that after paying the expenses of the said trust, including a commission of five per cent. upon the sum or sums of money which shall be actually paid to and received by the trustees, upon the sale of the whole or any part of the premises under the provisions hereof, and such sum for receiving and investing the said sum provided for a sinking fund, as may from time to time be agreed between the said Montour Iron Company and the trustees for the time being; then, whenever and so soon as, by the provisions hereof, the holders of the said bonds are entitled to receive the same, to pay, divide, and distribute the moneys which may come into the hands of the said trustees for the time being, as the same shall be received (retaining, however, always such sums as may, in the sole and absolute discretion of the trustees, be sufficient to meet the expenses of this trust, or to indemnify the said trustees for the time being from any liability, loss, or damages, by virtue of any act or acts as such trustees), among the holders of the said bonds *pro rata;* paying, however, in the first place, the interest thereon in full, and after paying such interest, then dividing any balance, also *pro rata,* among the said bond-holders, until the whole of the interest and principal due thereon shall have been fully and entirely paid : And when the same shall have been so fully and absolutely paid, and the said trustees fully released and discharged from or satisfactorily indemnified against all actions, suits, claims, or demands against them or either of them, either as trustees or individuals, for any matter or thing whatever, occurring in any way during the continuance or in discharge of this trust, or done or omitted by them, or either of them, as trustees, grantees or mortgagees, under this indenture ; then, to pay over the balance of the trust-fund in their hands, and assign and convey any trust-estate or property in their possession, unto the Montour Iron Company, their successors or assigns, for their sole use and behoof.

" And it is hereby expressly covenanted, agreed, and understood, by and between the said Montour Iron Company, their successors and assigns, and the said Isaac R. Davis, John Ashhurst, and Edwin M. Lewis, and the survivors and survivor of them, and the heirs, executors and administrators of such survivor, in manner following, that is to say :

" 1. That the said Montour Iron Company, and their successors, shall and will, at any time upon the demand of the trustees for the time being, or of a majority of them, from time to time, and at any time hereafter, grant, convey, assign, and set over unto the said trustees, and to the survivors or survivor of them, and the heirs, executors and administrators of such survivor, all real estate, and all the buildings, improvements, machinery, fixtures, in or upon such real estate which the said company shall hereafter in any way acquire or become seised or possessed of, or

which may be held by third persons for their use, and subject to their conveyance or control; and shall and will also make, do, seal, execute, deliver, and acknowledge, or cause to be made, done, executed, delivered, and acknowledged, all and every such further and other acts, matters, things, deeds, conveyances, and assurances in the law, for the better assuring, conveying, and confirming unto the said trustees for the time being, and the survivors and survivor of them, and the heirs, executors and administrators of such survivor and assigns, all and singular the hereditaments and premises, estate and property of every kind and description, hereby conveyed or intended so to be, or which are by these presents agreed and covenanted to be hereafter conveyed to the said trustees as aforesaid, as by the said trustees for the time being, or a majority of them, may, or his or their counsel learned in the law, shall be reasonably desired or required, for the better effectuating and carrying out the provisions, objects, and purposes of this mortgage, and securing the payment of the principal and interest of the bonds to be issued as aforesaid: All which estates shall be held by the said trustees for the time being, in, under, and upon the several and respective trusts, and for the uses and purposes, and subject to the powers and authorities herein mentioned, declared, given, and expressed.

" 2. That the said Montour Iron Company shall and will pay or cause to be paid into the hands of the said trustees for the time, being the annual sum of $28,000 in lawful money of the United States, which said sum shall be so paid in equal half-yearly payments of $14,000, on the first days of the months of April and October in each and every year, during the continuance of this trust (and until the bonds issued under the provisions hereof as aforesaid shall be fully and entirely paid and satisfied, with principal and interest), the first semi-annual payment to be made on the 1st day of April, A. D. 1856, and half-yearly thereafter as aforesaid: And the sums of money so paid unto the said trustees semi-annually, shall be held by them, and the survivors and survivor of them, and the heirs, executors and administrators of such survivor, in trust as and for a sinking fund, for the purpose of securing, discharging, and extinguishing the debt intended to be secured by this indenture of mortgage; and the same shall be applied, with any accumulation of interest, to the purchase of the bonds referred to in and secured by these presents, provided they can be obtained at or under par, at prices approved by the said trustees; and all the said bonds so purchased by the trustees shall be immediately endorsed by them as so purchased and held for the said sinking fund, and not to be transferred or disposed of by them in any way whatever; of which said investment notice shall be given to the said company, and the said bonds so endorsed shall be retained by the said trustees, and the interest thereon

shall be paid to them, until the final settlement of this whole trust: But if the trustees should not be able to purchase and obtain the said bonds, at prices considered satisfactory by them, then the said sinking fund, or so much thereof as shall not have been invested, with all its accumulation of interest, shall be invested in the loans of the state of Pennsylvania, until the said trustees in their discretion shall think proper to purchase the bonds of the said company secured by these presents as aforesaid, or until the bonds hereby secured shall become due and payable, either by lapse of time, or by the default of the said company, when the whole remainder of the said sinking fund, principal and interest, shall be paid over to the person or persons who may be or become the lawful holders of the said bonds, *pro rata*, until the same are fully paid and discharged; and any balance which may then still remain in the hands of the trustees for the time being, shall be paid over to the said Montour Iron Company, their successors or assigns, for their sole use and behoof.

"3. That the said Montour Iron Company and their successors shall and will cause and procure the buildings, improvements, machinery, and other property hereby conveyed in mortgage, to be insured and kept insured during the continuance of this trust, against fire, for not less than $250,000, and the policy or policies of insurance shall be made out in the name of the said company, and the premiums shall be paid by them; but they (the said policies) shall contain a clause that the amount of any loss by fire shall be paid over to the said trustees, and shall be by them applied, at the option of the company, either to the restoration and rebuilding of the buildings and premises injured by the said fire, or be added to the sinking fund hereinbefore mentioned and directed in relation to the same.

"4. That the said Montour Iron Company shall and will punctually pay to the holders of the said bonds, or of the interest warrants thereto attached, the interest thereon, semi-annually, as the same shall fall and become due, without any reduction for or on account of any taxes, charges, or assessments whatever, according to the terms and conditions in the said bonds contained, or according to the provisions of this indenture of mortgage; and shall and will, on the 1st day of July, A. D. 1869, or whenever the said principal shall by the provisions hereof become due and payable, fully and entirely pay off and satisfy the whole of the said bonds issued and secured under and by this indenture of mortgage, or so much thereof as may then remain due, principal and interest, without any further delay.

"5. That if, at any time hereafter, the said Montour Iron Company shall refuse, neglect, or omit, from any cause, either, first, to make the semi-annual payments for the sinking fund, as hereinbefore provided, or any one of them; or, second, shall

[Ashhurst *et al. v.* The Montour Iron Company.]

refuse, neglect, or omit to pay the semi-annual interest on the said bonds, or any of them, or the interest warrants thereto attached, or any of them, as the same falls or becomes due, as hereinbefore provided; or, third, shall refuse, neglect, or omit to pay the principal of the said bonds when the same shall fall and become due and payable, either according to the terms and conditions in the said bonds contained, or to the conditions, covenants, and provisions of this indenture of mortgage; then, immediately upon any such refusal, neglect, or omission for the space of thirty days, it shall and may be lawful for the trustees for the time being, upon the demand in writing of any person or persons, body politic or corporate, holding the said bonds to an amount not less than $10,000, to give notice to the said company in writing, that they have broken the covenants in this indenture of mortgage contained, and that according to its terms, the whole of the debt · or debts due upon the said bonds, principal and interest, shall and will, after thirty days, be taken and considered to have fallen and become due and payable one year before the date of such notice; and the said notice shall be served, either by leaving the same at any office of the company, or by delivering it to the president, or to the secretary, or to any or either of the managèrs thereof; then at the expiration of the further term of thirty days from the time of the delivery of such notice, unless the said Montour Iron Company shall within said period make the payments or fulfil and perform the covenants and conditions herein mentioned, which may have theretofore been omitted or broken, then, and immediately after the expiration of the said second period of thirty days, all the bonds issued by the said company, and referred to and intended to be secured by this indenture of mortgage, principal and interest, shall be taken and considered to have fallen and become due and payable one year before the date of such notice; and a *scire facias* may then be immediately issued hereon without any delay or objection whatever, any law, rule, or contract to the contrary notwithstanding.

" 6. That when and after the principal or interest of the said bonds, shall, either by their own terms, or in consequence of any refusal, neglect, or omission, of the said Montour Iron Company to comply with the covenants, provisions, and conditions herein contained, have fallen and become due and payable, or shall have been agreed to be so taken and considered, it shall be the duty of the said trustees, at their option, either immediately to issue a *scire facias* upon this indenture of mortgage and obtain judgment thereon, and proceed to sell and dispose of the mortgaged premises and property according to due course of law; or if they in their sole discretion, should think it more beneficial for the said bondholders (for the exercise of which discretion they shall in no case be made liable or responsible), they, the said trustees for the

time being, may sell and dispose of the whole of the trust estate, or any part or parts thereof, as is hereinbefore provided, without any interference or objection on the part of the said company, or of any or either of the said bond-holders; and the proceeds of such sales shall be held by the trustees for the time being, for the trusts and purposes, and to be paid and distributed as is herein provided for.

"7. That if the said Montour Iron Company shall, at any time during the continuance of this trust, desire or think it expedient to sell or dispose of any of the lands hereby conveyed or described or intended so to be, or any part or portion of the minerals therein, or of the appurtenances thereof, the said company shall and may, with the written consent of the said trustees, for the time being, grant, bargain, sell, convey, assign, transfer, exchange, or dispose of the same to any purchaser or purchasers; at least one-fourth of the purchase-money being paid in cash, and the balance secured by bond and mortgage on the premises, or on other sufficient real estate, freed from all the trusts hereby created and without any obligation upon the said purchaser or purchasers to see or to be responsible for the consideration-moneys given or paid therefor; provided always, that the whole consideration-moneys and the securities therefor shall be transferred and paid over to and be received by the said trustees for the time being, to be by them added to and form part of the sinking fund hereinbefore agreed to be created, and to be held subject to all the trusts, and for the uses and purposes hereinbefore stipulated, covenanted, and provided in relation thereto.

"8. That in case of the death, resignation, neglect, or refusal to act of any of the trustees herein named, or of any of their successors in the trust, or in case of a vacancy in the said trust from any other cause whatever, whereby the number of the said trustees, present or future, shall be reduced below the number herein named, then the surviving, remaining, or acting trustees or trustee for the time being, shall nominate and appoint a new trustee or trustees for the purpose of filling the said vacancy or vacancies, and supplying the place or places of such trustee or trustees dying, resigning, neglecting, or refusing to act; and upon such nomination, the said Montour Iron Company shall join in an application to a proper court to have the appointment of such trustee or trustees so nominated as aforesaid regularly made and entered of record according to law; and no trustee or trustees shall be in any case appointed, by the said court or otherwise, without the full and entire consent in writing of the other trustees or trustee for the time being, or of a majority of them.

"9. And it is hereby further covenanted and agreed as aforesaid, and this trust is accepted upon the express condition, that the said trustees shall not, nor shall any future trustees, nor

either or any of them, incur any liability or responsibility whatever, in consequence of permitting or suffering the said Montour Iron Company to retain the possession of the real estate hereinbefore mentioned, described, or referred to, and to use and occupy the same, or for allowing them or their lessees to dig mines, raise, carry away, consume, sell, or dispose of in any way, any minerals which may have been or may hereafter be found upon the premises; nor shall they, or either of them, be or become liable or responsible for any destruction, deterioration, determination, loss, injury, or damage which may be done or occur to the mines, buildings, machinery, fixtures, or estate hereby mortgaged, either by the said Montour Iron Company, or by their agents, servants, lessees, or by any other person or persons whatever, or by or from any accident, or other cause whatever; nor shall the said trustees, present or future, nor shall either of them, be in any way responsible for the consequences of any breach of the covenants on the part of the said Montour Iron Company, herein contained, nor of any act of the said company, their agents or servants; nor shall the said trustees, present or future, be or become responsible for any exercise of judgment or discretion in any case in which such discretion is allowed or given to them, nor for any moneys, property, or real or personal estate whatever, except what has actually and in fact come into their hands and possession by virtue of the provisions hereof; nor shall any or either of the said trustees, present or future, be liable or responsible for the acts or doings of the other trustees, or any of them, or for any other cause, matter, or thing, except his own wilful and intentional breaches of the trusts herein expressed and contained: Provided always, nevertheless, that if The Montour Iron Company aforesaid, their successors or assigns, shall and do well and truly pay or cause to be paid unto the person or persons, bodies politic or corporate, who shall become the holders of the bonds to be issued as aforesaid, the several and respective sums for payment whereof the said bonds shall be issued, on the day and time hereinbefore mentioned for payment thereof, together with the lawful interest for the same according to the conditions of the said recited obligations or bonds aforesaid, without any fraud or further delay, and without any deduction, defalcation, or abatement to be made of anything for or in respect of any taxes, charges, or assessments whatsoever, then and from thenceforth, as well this present indenture and the estate hereby granted, as the said recited obligations, shall become void and of no effect, anything hereinbefore contained to the contrary thereof in anywise notwithstanding."

The bill set forth that the Montour Iron Company paid the interest on their bonds down to, but excluding the semi-annual payment of interest, falling due on the 1st January 1858; and also paid to the complainants the amounts due on the sinking

[Ashhurst *et al. v.* The Montour Iron Company.]

fund, down to, but excluding the semi-annual payment, which became due on the 1st October 1857; but that they had since neglected and refused to make such payments to the complainants; and that such neglect and refusal had continued for the space of thirty days after the 1st October 1857.

That on the 11th January 1858, on the request in writing of. C. & J. Fallon, who were bond-holders to the amount of $40,000, the complainants had given notice to The Montour Iron Company, that they had broken the covenants in the mortgage; and that according to its terms, the whole of the debt thereby secured, would, after thirty days, be taken and considered to have fallen and become due and payable one year before the date of such notice.

That more than thirty days had elapsed since the giving of such notice, and thereby the whole amount secured by the said mortgage became immediately due and payable. That the Montour Iron Company had no funds to make the semi-annual payment to the complainants, as trustees, due on the 1st October 1857; that their profits were not more than sufficient to meet their ordinary expenses, and were wholly inadequate to pay the interest due upon their bonds; and that unless the mortgaged premises were sold, the security of the bond-holders would be greatly impaired, if not wholly lost and destroyed. They therefore prayed the court to decree a sale of the mortgaged premises, and that the proceeds might be divided and distributed among the bond-holders *pro rata*, in the manner set forth in the mortgage.

The court below, after hearing the case on bill, answer, and master's report, decreed a sale of the mortgaged premises as prayed for in the bill. And from this decree the defendants appealed.

*Bullitt*, for the appellants.

*Gerhard*, for the appellees.

The opinion of the court was delivered by

Woodward, J.—Since the enlargement of the equity powers of the courts in Pennsylvania, by the legislation of 1836 and 1840, have they jurisdiction to decree a sale of a mortgaged estate, at the instance of the mortgagee?

The jurisdiction, if possessed, was conferred by the legislation above referred to. Under none of the constitutions of Pennsylvania, and under no Act of Assembly prior to 1836, is it pretended that the courts possessed any such power. The remedies upon mortgages before that date were twofold—first, the common law remedy of entry or ejectment by the mortgagee, whereby he gained the possession and took the profits of the estate, subject,

[Ashhurst *et al. v.* The Montour Iron Company.]

however, to the equity of redemption in the mortgagor; and, secondly, the *scire facias* given by the old provincial Act of 1705, whereby the equity of redemption could be foreclosed, and the estate brought to sale, at any time after a year had elapsed from default in making the last payment secured by the mortgage.

When the revisers prepared the Act of 1836, enlarging the equity powers of the courts, they took notice of the chancery jurisdiction in England over mortgages, and of the remedies existing in Pennsylvania, and they said, "We find no defects in our law upon this point, and have no occasion to borrow any of the powers of the English Chancery." What they reported, therefore, was not intended by them to confer the jurisdiction we are now asked to exercise. And it is a reasonable inference that the legislature, when they adopted, without change of language, the sections reported by the revisers, adopted them upon the same reasons for which they were reported.

Nor will this inference be weakened by attention to the terms in which the new equity powers were conferred. "The Supreme Court and the several courts of Common Pleas shall have the jurisdiction and powers of a court of chancery, so far as relates —to the control, removal, and discharge of trustees, and the appointment of trustees, and the settlement of their accounts— the care of trust moneys and property, and other moneys and property made liable to the control of said courts—the supervision and control of partnerships and corporations, other than municipal corporations—and all cases over which courts of chancery entertain jurisdiction on the grounds of fraud, accident, mistake, or account."

Omitting several irrelevant provisions of the Acts of 1836 and 1840, I have assembled together, in the above extract, all of the provisions that can, by any reasonable construction, be thought to bear on the question before us. It will be observed, that mortgages are not mentioned or referred to in these provisions.

But control of trustees, of trust property, and of trustees' accounts is expressly conferred, and we are pointed to the fact that the mortgage before us creates several trusts, and styles the mortgagees trustees. Hence, it is inferred, we have jurisdiction over the subject-matter, and may decree a sale as an incident of that jurisdiction.

This would be undoubtedly correct, if the jurisdiction were invoked by creditors, or any parties standing in the relation of *cestuis que trust.* If the trustees were shown to be mismanaging the trust, or wasting the estate, they might be restrained or removed—they could be compelled to account to their *cestuis que trust* and to the mortgagors, and the courts, having assumed jurisdiction on any of these grounds, would take all necessary care of the moneys and properties in their hands. So far our credentials

would be clear, but the question still remains, whether we have power, before jurisdiction has attached on any of these grounds, to sell the mortgagor's estate at the instance of the mortgagees.

Now, between mortgagor and mortgagee, as such, there is no trust. Mortgages have always been regarded in Pennsylvania, as they are in chancery in England, as mere securities for money, or for performance of collateral conditions. They establish the relation of debtor and creditor, rather than of trustee and *cestui que trust*. I have alluded already to the right of the mortgagee to proceed, *in invitum*, against the mortgagor, which can never take place between a trustee and *cestui que trust*. They have always an identity and unity of interest. In general, a trustee is not allowed to take away the possession from his *cestui que trust*, but a court of equity never interferes to prevent a mortgagee from assuming possession after breach of any condition. In this the contrast between the two characters is distinctly marked. See Sir Thomas Plumer's observations in Cholmondeley *v.* Clinton, 2 *Jac. & Walk.* 182–189.

And if we look through the mortgage in this case, we shall see that, in accordance with the general principle, it establishes no other than the ordinary relation of mortgagor and mortgagee between the Montour Iron Company and the gentlemen named as trustees, and that the trusts raised are for the benefit of the bondholders.

The instrument is called a trust mortgage; is dated the 28th September 1855; recites the purpose of the Montour Iron Company to borrow $600,000, by an issue of twelve hundred bonds, each for the sum of five hundred dollars, and for the purpose of securing the payment of principal and interest of these bonds the managers recite their authority to execute a mortgage on the whole real estate, machinery, and fixtures belonging to said company. It then proceeds to convey to the three designated trustees, the plaintiffs on this record, all the estates of the company, and then comes the declaration of the trusts as follow :—

1st. To permit the company to retain the possession and use of the mortgaged premises. This is no more than a simple declaration of the ordinary legal effect of such instruments. Mortgagors do of right retain possession, until breach of some condition. From the time of James I. it was usual to insert such a clause in the English mortgage, but if there be no such express agreement in the deed, it is the general understanding of the parties, and their tacit consent is presumed : 4 *Kent's Com.* 159.

2d. The second trust is, that whenever it shall become the duty of the trustees to enter and take possession, they shall issue process for the sale of the premises, or proceed to sell them without process, after giving the notice prescribed. This is a trust for the benefit of the purchasers of the bonds, and there is nothing in it that impairs or qualifies the mortgage character of

the instrument. "It is usual," says Chancellor KENT, 4 *Com.* 146, " to add to the mortgage a power of sale, in case of default, which enables the mortgagee to obtain relief in a prompt and easy manner, without the expense, trouble, formality, and delay of foreclosure by a bill in equity."

The 3d trust is to pay the proceeds of sale to the bond-holders, after deducting expenses, and to pay over any residue to the Montour Iron Company. This, again, is no more than what is the duty of every mortgagee in possession; for, after exercising the power of sale, he is bound to account to the mortgagor. It is one of those cases over which courts of chancery entertain jurisdiction under the head of account, and is clearly within our Act of 1836. In a proper case, and at the suit of the mortgagor, we should not hesitate to exercise the jurisdiction.

Such are the trusts declared. The instrument then proceeds to express the covenants between the immediate parties. The company covenants—

1st. For conveyance to the trustees of any subsequently acquired real estate.

2d. For the payment to the trustees of the annual sum of twenty-eight thousand dollars, as a sinking fund for the redemption of the bonds.

3d. For maintaining an insurance upon their buildings.

4th. For the punctual payment to holders of the bonds, or of the interest warrants thereto annexed, the interest thereon as the same shall become due, and the principal when it shall fall due.

5th. In case of failure to make the stipulated payments, on account either of the sinking fund, or of the interest or principal of the mortgage debt, the trustees may, at the instance of holders of bonds to the amount of $10,000, give the company *written* notice that they have broken their covenants, and that the whole debt, principal and interest, will, after thirty days, be taken and considered to have become due one year before the date of the notice, and after sixty days from the date of such notice a *scire facias* may be immediately issued.

6th. When the company has made default in any of the payments stipulated for, it is made the duty of the trustees, at their option, either to issue *scire facias*, and proceed to sell the premises by due course of law, or to sell the same, as before provided, without legal process, by auction, after notice in Philadelphia and New York newspapers.

Then follow several other unimportant stipulations, and the usual defeasance clause of mortgages.

From this analysis of the document, it is apparent, that whilst the relation of trustee and *cestui que trust* is established and accurately defined between the trustees and the purchasers of the bonds, the relation between the trustees and the Montour Com-

pany is that of mortgagor and mortgagee simply. This latter relation is, indeed, attended with some stipulations that are unusual in the ordinary Pennsylvania mortgage, but which are not unknown to the law of mortgages, and which are very necessary where, as in this instance, a marketable security was to be created as the means of borrowing money. This class of instruments, quite unknown to the framers of our old Act of 1705, have become very common in our day. They are *tripartite* in substance and effect. Besides the two contracting parties, there are the creditors, unascertained, indeed, when the instrument is made, but well known as a party when the remedies come to be discussed. Between them and their trustees it is nothing but a trust—between the trustees and the mortgagor it is nothing but a mortgage. And if the creditors be regarded as the substantial plaintiffs on this record, then, as between them and the mortgagor, the instrument can be regarded as nothing else than a mortgage. Acting through their trustees, they have all the remedies they have stipulated for, and all which the law has provided for mortgage-creditors against mortgage-debtors, but they have not, either on their own account, or in behalf of their trustees, the right to come into chancery for a decree of sale. The reason is, that power to decree a sale in equity against the mortgagor has not as yet been given to the courts.

I said they have all the remedies stipulated for. A mortgage is a contract. And contracts are to be construed and administered, as near as may be, according to the intentions of the parties. The lawful provisions of the contract are law to the parties. When these parties contracted, they contemplated the possibility of default of payment, and provided for it. They said the trustees should redress any such breach, by assuming the possession of the premises for the benefit of the creditors, or by proceeding by *scire facias* to bring them to a judicial sale, or by selling the premises themselves, after certain stipulated notice. These were the modes in which they agreed breach of the conditions of this contract should be redressed. Did they dream of any other? And especially of that undefined and equivocal power which is now invoked? No word they used implies that they did, but the trifold remedy provided excludes such an implication.

Ordinarily, we do not encourage parties to come into courts of equity, whilst they have ample remedies outside. It would be strange if we should strain the grant of our chancery powers, to embrace a case so well furnished with other remedies.

The obscure clause of the Act of 1836, which speaks of moneys and properties made subject to courts of chancery, may have intended to confer full powers over such moneys and properties where jurisdiction had attached under any of the ordinary heads of account, injunction, &c., but could not have been framed to

confer a new and extraordinary power, such as is invoked here. Nor do those portions of the act which relate to the control of corporations, and to cases of fraud, accident, mistake, or account, apply to this question. The present bill, indeed, does not make a case under either of these heads of equity.

It was suggested, that the trustees had a right to exercise their powers under the eye and with the approbation of this court, and of course to obtain, beforehand, our sanction to the title they proposed to convey. If jurisdiction over their accounts belonged to us, there might be some ground for this suggestion; but under the 15th section of the Act of 14th June 1836, that jurisdiction is vested in the Common Pleas, and if the plaintiffs wanted judicial advice, they should have gone there for it.

A sale under our authority, we having no jurisdiction to decree it, would do the title more harm than good. The trustees have full power given them to convey in fee simple discharged of all trusts, and there ought to be no question about whatever title they grant in pursuance of the terms expressed in the mortgage.

The objection that this case was ruled at Nisi Prius is groundless. If the Supreme Court had jurisdiction, it was exercisable by the judge at Nisi Prius.

There are some other points on the record, but it is not necessary to notice them, as our want of jurisdiction is fatal to the whole proceeding.

This ruling is not to be considered inconsistent with those decrees we have made for the sale of mortgaged premises on creditors' bills. This is the first case we have had of mortgagee and mortgagor. We hold that our equity powers do not embrace that relation.

                                        The decree is reversed.